## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **MIKE HOOVER,** | |
| **Plaintiff,** | **CASE NO. 4:12CV3197** |
| **vs.** | |
| **THE STATE OF NEBRASKA through the NEBRASKA DEPARTMENT OF ADMINISTRATIVE SERVICES; AMY ARCHULETA, individually and in her official capacity; and CARLOS CASTILLO, individually and in his official capacity,** | **MEMORANDUM AND ORDER** |
| **Defendants.** | |

This matter is before the Court on the Motion for Summary Judgment (Filing No. 18), filed by Defendants, the State of Nebraska through the Nebraska Department of Administrative Services ("DAS"), Amy Archuleta ("Archuleta"), and Carlos Castillo ("Castillo") (collectively "Defendants"). Also before the Court is the Defendants' Motion to Strike and Objections to Plaintiff Mike Hoover's ("Hoover") Exhibits (Filing No. 33). For the reasons discussed below, the Motion for Summary Judgment will be granted, and the Motion to Strike will be denied as moot.

## FACTUAL BACKGROUND

Unless otherwise indicated, the following is a summary of facts that were presented in the parties' briefs and were supported by pinpoint citations to admissible evidence in the record that the parties have admitted, or that the parties have not properly resisted as required by NECivR 56.1[1] and Fed. R. Civ. P. 56:

---

[1] "Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response." NECivR 56.1(b)(1).

I.      **Background Information**

DAS is the agency of the State of Nebraska that provides budgetary, inventory, and financial accounting services for the State of Nebraska.  See Neb. Rev. Stat. § 81-1101 (Reissue 2008).    DAS fulfills administrative functions of fiscal control, centralization of services, personnel services, and risk management.  Neb. Rev. Stat. § 81-1108.  Among other things, the Director of DAS is the general accountant for the State of Nebraska, keeps all papers relating to the accounts and contracts of the state, and keeps all records relating to revenue, debt and state fiscal affairs not required by law to be placed in some other office or kept by some other officer or person. Neb. Rev. Stat. § 81-1107.01.   Several divisions within DAS assist in fulfilling its statutory functions, including a division devoted to information management services.  Neb. Rev. Stat. § 81-1108.

Hoover was an employee of DAS assigned to the Nebraska Information Services (hereinafter "NIS") division of DAS from March 5, 2007, until October 14, 2011.  When Hoover began his DAS employment on March 5, 2007, he was hired to work as an IT Business Systems Analyst/Lead for the NIS division, with an hourly salary of $20.279. On September 17, 2007, Hoover received an increase in pay from $20.887 an hour to $21.932 an hour upon the successful completion of a six month probationary period after being hired.  Hoover submitted a resignation on October 4, 2011, with an effective date of October 14, 2011.  (Filing Nos. 20-3, 20-4.)  Hoover claims that his resignation was not voluntary, but that he was forced to resign by Castillo and the general work environment.  (Filing No. 26-8, Aff. of Mike Hoover ("Hoover Aff."), ¶ 55.)

2

At all times relevant to this action, Castillo was the Director of DAS. Defendants assert that Archuleta was the Division Administrator for NIS until she was appointed by Director Castillo to another position within DAS on January 18, 2011.[2] Archuleta was Hoover's direct supervisor from March 5, 2007, until January 18, 2011. When Archuleta changed positions in January 2011, Michael Keays ("Keays"), was selected to serve as supervisor of the NIS Division, and consequently became Hoover's direct supervisor. Keays was Hoover's direct supervisor from approximately January 18, 2011, until August 1, 2011. Archuleta testified that after she accepted a position outside the NIS Division, she ceased being Hoover's supervisor. (Filing No. 20-51, Affidavit of Amy Archuleta ("Archuleta Aff."), ¶ 53.) Kay Mencl ("Mencl") was Hoover's direct supervisor from August 1, 2011, until Hoover's resignation from his DAS employment on October 14, 2011. Julie Perez ("Perez") was not Hoover's supervisor, but worked on the NIS team.

## II.    Hoover's Performance Reviews at DAS

Hoover received periodic employment reviews throughout his employment with DAS. Archuleta completed each of these reviews during her time as Hoover's supervisor, from March of 2007 through January of 2011. From the period of March 2007 through July 2008, Archuleta gave Hoover positive performance reviews, and Hoover received a 5% raise after his six month probationary period ended. Hoover's performance review was less positive during the period of August 2008, through

---

[2] Hoover does not dispute this fact but states that it must be struck because it is not supported by the evidence. NECivR 56.1(b)(1) states that "[p]roperly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response." Regardless of whether the statement of fact is ambiguous, it is properly referenced and not controverted in Hoover's response. Accordingly, it will be considered admitted.

December 2009.  Defendants claim that Hoover did not meet expectations with regards to accountability and communication skills during that time.   (Filing No. 20-17 at 1.) Hoover argues that his reviews only became negative to enable a raise for Mencl and Perez.  (Filing No. 20-25.)  Hoover claims his negative reviews also came as the result of an informal complaint with DAS.  (Filing No. 20-32.)  Hoover's performance reviews were satisfactory for the period of January 2010 through December 2010.

Hoover claims that he had the heaviest workload of his team and that he was given additional duties that had previously belonged to other employees. (Hoover Aff. ¶ 13, 14.)  Hoover also claims that the financial area for which he was responsible was consistently performing adequately at a minimum and no issues were noted by the audit that was conducted by NIS. (Hoover Aff. ¶¶ 43-44.)

III.    **Mencl and Perez's Pay Raise**

All requests for in-grade pay adjustments in DAS were required to originate with the Division Administrator, and then be reviewed by the Agency Director, the Agency Personnel Administrator, and the State Personnel Office.  On May 27, 2008, Archuleta drafted a memorandum to Mike McCrory ("McCrory"), in the Personnel Office, and Mike Carroll ("Carroll"), the DAS Personnel Administrator, asking for an in-grade pay adjustment for Margo Sawyer ("Sawyer"), who worked as the IT Business System Analyst Coordinator.  Archuleta cited the increase in volume and complexity of Sawyer's work load to support her request for a ten percent increase. Also on May 27, 2008, Archuleta drafted a memorandum to McCrory and Carroll asking for an in-grade pay adjustment for IT Business System Analyst Coordinators Mencl (then having the last name "McKay") and Perez.  Archuleta cited inequities in salary and the increase and

4

complexity of Mencl and Perez's work load to support a request for a 15 percent pay increase.  (Fling No. 20-21 at 2-3.)  Carroll in turn, drafted a memorandum to Castillo discussing the pay raise requests.    (Filing No. 20-25.)    According to Carroll's assessment, the highest paid employees were male and the lowest paid employee was a female.  In his memorandum, Carroll noted that Hoover—who had only one year and four months of state experience, and experience in his classification—was at the exact same rate of pay as Mencl and Perez, despite the fact that Mencl had four years and nine months of state experience, and three years of experience in her classification, and Perez had eleven years and five months of state experience, and five years and nine months of experience in her classification.

In his memorandum to Castillo, Carroll ultimately concluded that he would not recommend a 15 percent pay raise for Mencl and Perez, but would instead recommend a 5 percent pay raise.  (*Id.* at 4.)  The request was based on Carroll's conclusion that Mencl and Perez had become more proficient and knowledgeable within NIS, had been assigned additional duties not shared with other employees, and there was no indication that their previous duties were removed when they were assigned new duties. (*Id.*)  In the memorandum, Carroll also advised Director Castillo that a salary grade adjustment for Hoover needed to be considered in the future as well.  Specifically, Carroll stated,  "I believe that two other issues need to be considered. The first is Mike Hoover. Mike is in the same classification and his current rate of pay is equal to Julie and Kay's. Based on the information provided, it is uncertain if Mike has additional duties or modules assigned to him that would be outside the scope of his position. I recommend that we

5

be progressive and address this issue if this request, or modified request, is forwarded to State Personnel." (*Id.*)

On January 28 and January 30, 2009, respectively, Director Castillo and Carroll drafted letters officially requesting a 5% pay increase for Mencl and Perez.   On February 3, 2009, McCrory granted the requests.  Defendants allege that Hoover was not eligible for an in-grade pay increase because he did not have a considerable increase in workload and he did not qualify for an in-grade pay increase based upon the factors set forth by the State of Nebraska Classified System Personnel Rules and Regulations.  (Filing No. 20-21 at 2-3.)  Further, Defendants state that Hoover failed to request a pay raise.  (*Id.*)  Hoover claims that his workload had increased and argues that the pay raise request had to originate with the Division Administrator, not the employee.  Hoover argues that it was discriminatory for Archuleta to initiate the request for the female employees, only.

**IV.     DAS Work-From-Home Policies**

During the second half of 2009 and through the beginning of 2010, Archuleta's team was responsible for a major system upgrade.  At the beginning of the project, the team discussed allowing team members to work from home periodically.  Archuleta allowed Hoover to work from home for a period of time to do testing, but later discontinued the arrangement on September 18, 2009.  Defendants claim Hoover's work-from-home privileges were discontinued because of Hoover's lack of progress and failure to communicate with Archuleta.  (Filing No. 20-51 ¶ 27.)  Hoover alleges that females were allowed to work from home after his privileges had been discontinued.

6

(Filing No. 26-8 ¶ 19.)  Archuleta declined to allow another male employee to work from home while he underwent chemotherapy.

## V.    Allegations of Wrongdoing Against Hoover and Hoover's Complaints

On August 14, 2009, DAS Information Technology Business System Analyst Coordinator Lacey Pentland ("Pentland") reported that Hoover returned from his lunch period with alcohol on his breath.  (Filing No. 20-50 ¶ 7.)  Pentland had previously witnessed Hoover consume alcohol on his lunch period and return to work.  Hoover denied having been drinking and Archuleta believed him.  Archuleta did not investigate the accusation further.  Later, Hoover was very upset and called Pentland at home and asked if she was the one that told Archuleta he may have been drinking over the lunch hour.  Pentland was afraid Hoover would find out that she was the one who reported it.

On August 25, 2009, Hoover filed an Informal Complaint Form with DAS. In the two-page attachment to the Informal Complaint Form, Hoover stated that he "was reeling from having been accused of" drinking over the lunch hour, and that he "was so upset that someone had lied for the intent of trying to have [him] terminated or poison [his] future career path at the State of Nebraska that [he] lost sleep, was emotionally drained over the entire week and . . . [was] trying to figure out why anyone would tell [Archuleta] this savage lie."  (Filing No. 20-32 at 2-3.)  Hoover stated his Informal Complaint was not grieving the conduct of Archuleta, to wit: "My grievance is not against [Archuleta], rather the person that is trying to defame my character, plant negative seeds in the mind of management, and continue to create a toxic work environment for their own gain. I am extremely upset that this unethical person has [made] a premeditated, malicious lie, with INTENT to harm me, and suffer absolutely no

repercussions." (*Id.* at 2) (emphasis in original).  Hoover asked that Archuleta reveal the name of his accuser and indicated that he had contacted an attorney and would pursue a civil lawsuit if necessary.  Hoover also requested that his accuser be removed from his team, be moved to another physical location, and that a notation be placed on the accuser's employment record.  Hoover did not allege that Archuleta discriminated or harassed Hoover on the basis of his sex.

On or about September 23, 2009, Carroll conducted an independent investigation of Hoover's August 25, 2009, Informal Complaint.  Carroll determined that the incident was not malicious nor an intentional act to harm Hoover and that Pentland was just following the procedure she had been taught in her training.  Carroll determined that Archuleta should have made an assessment based on her observation of Hoover and that if she had a reasonable suspicion of alcohol use, she should have contacted Human Resources instead of contacting Hoover directly.  However, Carroll noted that Hoover's complaint was not about the process Archuleta followed, but rather focused solely on the employee that made the report.  Carroll declined to reveal the name of the accuser and stated that Pentland did not violate any policies, nor did she attempt to "wage a personal attack against" Hoover.  (Filing No. 20-33 at 2.)

Defendants accused Hoover of failing to perform his job duties adequately.  These accusations included the constant need to direct Hoover to do his work (Filing No. 20-51 ¶ 39) and Hoover's repeated failure to respond to user complaints and emails (*id.* ¶ 40).  Defendants also asserted that because Hoover elected not to pay for parking, he spent a significant amount of time each day moving his car (Filing No. 20-48 ¶ 16), and routinely came to work late and left early (Filing No. 20-52 ¶¶ 13-14).

Defendants also claimed that Hoover failed to complete a major systems upgrade, and was uncooperative when confronted about the lack of progress.  (Filing No. 20-51 ¶ 41, Filing No. 20-35 at 2.)  Hoover denied these allegations, and asserted in his affidavit that his workload was significantly higher than that of his coworkers, that he routinely rode his bicycle to work or would move his car during break periods, and that coworkers including Perez often left work before he did.  (Filing No. 26-8 ¶¶ 18, 23-25, 41, 66.)

 On November 20, 2009, Hoover filed a Charge of Discrimination with the Nebraska Equal Opportunity Commission and the Equal Opportunity Commission.  In his Charge of Discrimination, Hoover claimed that DAS discriminated against him due to his gender in that he was paid a lower wage, was harassed, and was treated differently with regard to home office hours and in-grade pay raises.  With respect to harassment, Hoover alleged that Archuleta "made harassing comments about men, including how a multi-tasking woman can outperform a man at any time and would refer to her male counterparts as 'penis slingers.'"  Hoover also alleged that on August 31, 2009, "Archuleta came out of her office and threw a box of copy paper against the wall while making the comment that she hated working with men."  (Filing No. 20-36 at 1-2.)  Hoover alleged that "during a team meeting Archuleta said that women are more important to the family because they have more family issues to deal with." (*Id.*)  The EEOC investigated the allegations, did not file suit, and on November 18, 2011, issued Hoover a right-to-sue letter.

After Hoover filed his Charge of Discrimination with the EEOC and NEOC, Castillo directed Carroll and Laura Peterson ("Peterson"), DAS General Counsel, to conduct interviews with the personnel who worked in Archuleta's division.  On

9

December 21, 2009, Carroll and Peterson conducted interviews with Archuleta's team. On February 10, 2010, Director Castillo issued a memorandum to Archuleta stating, "The interviews produced a mixture of positive and negative opinions regarding your leadership and management attributes." (Filing No. 20-38 at 1.) The memorandum set forth several areas Archuleta needed to focus on to improve the work culture in her area and instructed her to attend six courses and to have weekly meetings with a partner administrator.

On January 8, 2010, Hoover was placed on a Work Improvement Plan. On January 11, 2010, Hoover emailed Human Resources employee Patty Runge complaining about the work improvement plan, his workload, his lack of help, and the accusations that had been lodged against him regarding drinking and being uncooperative. Although Hoover did not complain of sex discrimination in the January 11, 2010, email, he claims that he did specifically complain about how he was being treated in comparison to two female co-workers. (Filing No. 20-40.) Hoover failed to meet the deadlines set in the January 8, 2010, Work Improvement Plan.

In mid-2010, Hoover wanted to enroll in the State of Nebraska's "Wellness" health insurance benefits plan. Hoover was not able to complete the health assessment by the established deadline and therefore did not enroll in the program. Hoover claimed that the instructions that state employees were provided regarding how to complete the assessment were flawed, causing him to complete the wrong assessment. Hoover sent a complaint to Central Services Administrator Roger Wilson ("Wilson"), Employee Wellness and Benefits Administrator Paula Fankhauser ("Fankhauser"), Castillo,

10

Peterson, the Governor, and the legislative ombudsman.  Despite Hoover's complaints, no exceptions were made to allow Hoover to enroll in the program.

Defendants allege that in January of 2011, Hoover ran a confidential report on a DAS computer regarding other employees' benefits information.  In January of 2011, Castillo asked the Nebraska Office of the Chief Information Officer ("OCIO") to begin monitoring Hoover's work computer, based on this breach.  During the review of Hoover's computer, the OCIO found information that Hoover had violated the Computer Use Policy.  Hoover denies that he violated the policy, and explained that he "accessed the benefits Report because he wanted "to see if most families enrolled in the Wellness plan or one of the other options."  (Filing No. 20-46 at 3.)  Hoover argued that he should not be disciplined for looking at the report because the State allegedly publishes people's personal information on several websites.  Hoover alleged that the allegations of violating the policy were the result of harassment, retaliation and intimidation.

## STANDARD

"Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, demonstrates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  *Gage v. HSM Elec. Prot. Serv., Inc.,* 655 F.3d 821, 825 (8th Cir. 2011) (citing Fed. R. Civ. P. 56(c)).  The court will view "all facts in the light most favorable to the non-moving party and mak[e] all reasonable inferences in [that party's] favor."  *Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 819 (8th Cir. 2011).  However, "'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those

11

facts.'"  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).

"If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986).  . "[W]here the *nonmoving* party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves."  *Id.* at 324 (emphasis added).

In response to the movant's showing, the nonmoving party's burden is to produce "evidentiary materials that demonstrate the existence of a 'genuine issue' for trial."  *Id.* at 331.  "[T]he absence of an adequate response by the nonmovant, even after the moving party has carried its initial burden of production, will not automatically entitle the movant to entry of summary judgment."  *Lawyer v. Hartford Life & Acc. Ins. Co.*, 100 F. Supp. 2d 1001, 1008 (W.D. Mo. 2000) (citing *Celotex*, 477 U.S. at 331).  Instead, "the moving party must show that the evidence satisfies the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it."  *Id.* (citing *Celotex*, 477 U.S. at 331).

In other words, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party"–where there is no "'genuine issue for trial'"–summary judgment is appropriate.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968)).

**DISCUSSION**

**I.     Hoover's Equal Pay Act Claims**

Hoover's first cause of action alleges that he was paid less during his employment with DAS than female employees for work requiring equal skill, responsibility, and effort, in violation of the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d) and the Nebraska Equal Pay Act ("NEPA"), Neb. Rev. Stat. § 48-1221 (Reissue 2004). These claims will be considered together because Plaintiff's NEPA claims "are subsumed within the federal law claims." *Hunt v. Nebraska Pub. Power Dist.*, 282 F.3d 1021, 1027 n. 5 (8th Cir. 2002).

As a general matter, the EPA and NEPA prohibit pay discrimination on the basis of sex.  *See* 29 U.S.C. § 206(d); Neb. Rev. Stat. § 48-1221.  "To succeed under the EPA, a plaintiff must prove that the employer discriminated on the basis of sex by paying different wages to men and women performing equal work under similar conditions."  *Bearden v. Int'l Paper Co.*, 529 F.3d 828, 833 (8th Cir. 2008) (citing *Brown v. Fred's, Inc.,* 494 F.3d 736, 740 (8th Cir.2007)).  To establish a prima facie case in an EPA claim, "a plaintiff must show by a preponderance of the evidence that (1) [he] was paid less than a [fe]male employed in the same establishment, (2) for equal work on jobs requiring equal skill, effort, and responsibility, (3) which were performed under similar working conditions."  *Hunt*, 282 F.3d at 1029.  "If a plaintiff establishes a prima facie case, the burden then shifts to the defendant to prove one of four statutory affirmative defenses."  *Price v. N. States Power Co.*, 664 F.3d 1186, 1191 (8th Cir. 2011).

13

a.    **Hoover's Prima Facie Case**

Defendants argue that Hoover failed to demonstrate that he performed equal work compared to Mencl and Perez, Hoover's alleged comparitors.  It is well established that the jobs of the plaintiff and the comparator "need not be identical to be considered 'equal' under the EPA; they need only be substantially equal." *Simpson v. Merchants & Planters Bank,* 441 F.3d 572, 578 (8th Cir.2006) (citing *Hunt,* 282 F.3d at 1029).  The question of whether two jobs are equal is a factual one.  *Id.*  The determination "requires a practical judgment on the basis of all the facts and circumstances of a particular case."  *EEOC v. Universal Underwriters Ins. Co.*, 653 F.2d 1243, 1245 (8th Cir. 1981). Although this inquiry is factual, summary judgment may be granted in an EPA case where there is no genuine dispute that the plaintiff was not subjected to unequal pay for equal work.  *See Grabovac v. Allstate Ins. Co.*, 426 F.3d 951, 956 (8th Cir. 2005) (summary judgment on the plaintiff's unequal pay claim was appropriate where the record showed that she had the second highest salary and bonus in the year in question when compared to four male marketing business consultants); *Younts v. Fremont County, Iowa*, 370 F.3d 748, 753 (8th Cir. 2004) (affirming summary judgment for the employer on an EPA claim based on insufficiency of evidence comparing the plaintiff's job to a male comparator).

Hoover claims that he should have been granted a pay raise at the same time as Mencl and Perez.  However, the evidence he submits in support of this claim does not demonstrate that his work was substantially equal to that of Mencl and Perez.  For example, Hoover offers a memorandum prepared by Mike Carroll on November 7, 2008 (Filing No. 26-4), as evidence that Hoover needed to be considered for a raise but was

14

not. However, in summarizing the duties of Mencl, Perez, and Hoover, the memorandum demonstrates marked differences in the employees' main functions within their classifications. For example, Hoover worked in the financial module, including accounts payable and general accounting; Perez worked in sales order, capital management, price management and fixed asset modules; and Mencl worked in procurement and inventory integrated into the manufacturing modules. (*Id.* at ECF 3.) Further, the memorandum notes that Mencl and Perez "were assigned additional duties that appear to be unique and outside of their current modules." (*Id.*) Although Hoover claims he also took on additional duties, he presents no evidence to demonstrate that the additional duties were equal to those of Mencl and Perez. (*See* Hoover Aff., Filing No. 26-8, ¶¶ 12, 14, 22.) Absent evidence that Hoover's duties were comparable to those of Mencl and Perez, conclusory statements that the tasks were equal are insufficient. *See Younts*, 370 F.3d at 753 ("We are not particularly interested in a plaintiff's conclusory allegations about which jobs are equal.); *Berg v. Norand Corp.*, 169 F.3d 1140, 1146 (8th Cir. 1999) (holding conclusory affidavit testimony that two jobs are equal does not establish a prima facie case under the EPA). Hoover has not established that his job was substantially equal to that of his alleged comparitors. Accordingly, he has failed to establish his prima facie case.

**b.    Affirmative Defenses**

Even assuming Hoover has stated sufficient facts to establish a prima facie case, the evidence demonstrates that the Defendants are entitled to a statutory affirmative defense. As stated above, if a plaintiff establishes a prima facie case, the burden of proof shifts to defendant to establish one of four statutory affirmative defenses. *Price*,

15

664 F.3d at 1191. The statutory defenses require an employer to demonstrate that any discrepancy in wage is explained by "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). "In an EPA case, 'a defendant cannot escape liability merely by articulating a legitimate non-discriminatory reason for the employment action.... [it] must prove that the pay differential was based on a factor other than sex.'" *Price*, 664 F.3d at 1191 (quoting *Taylor v. White*, 321 F.3d 710, 716 (8th Cir. 2003)); *see also Hutchins v. Int'l Bhd. of Teamsters*, 177 F.3d 1076, 1080 (8th Cir. 1999) (concluding that an employer established an affirmative defense to an EPA claim by showing salary increases were based on length of service as well as employee evaluations); *Timmer v. Michigan Department of Commerce*, 104 F.3d 833, 844 (6th Cir. 1997) (concluding that employer established affirmative defense reasoning that a red circling policy was a factor other than sex that would explain the pay difference between men and women at the company).

Defendants have presented ample evidence to demonstrate that any difference in pay was based on factors other than sex. Hoover's arguments are based on the pay raises Perez and Mencl received, and the evidence demonstrates that these raises were based on merit and quantity of production. As noted above, the memorandum of Mike Carroll (Filing No. 20-25) described the additional duties Perez and Mencl had taken on in addition to their assigned modules. These new duties were not shared with other employees and there was no indication that any previous duties had been removed. (*Id.* at ECF 2.) The pay raises received were based on the increased

16

workload of Mencl and Perez.   (*See e.g.* Filing No. 20-28.)   Accordingly, any discrepancy in pay was based on merit, quality, and quantity of work, all factors other than sex.   In response, Hoover has stated only that the Defendants are not entitled to affirmative defenses "because there was no evidence that it wasn't Hoover's gender given his equity or superiority in workload, performance, training, experience, and qualifications."  (Filing No. 25 at 43.)  This reasoning misinterprets the parties' burdens of proof.  Based on the evidence before the Court, no reasonable jury could conclude that the raises for Mencl and Perez were discriminatory or based on their sex.  Hoover only offers evidence of general derogatory statements uttered by Archuleta, but the ultimate decisions on the raises were made by other directors after a thorough investigation of Mencl and Perez's additional duties.   Accordingly, Defendants have demonstrated that any discrepancy in pay for equal jobs was based on factors other than sex, and Hoover has not meaningfully challenged this conclusion.  Accordingly, the Defendants are entitled to summary judgment on Hoover's EPA and NEPA claims.

## II.    Title VII Wage Discrimination Claims

Hoover's second claim alleges that Defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), and the Nebraska Fair Employment Practice Act ("FEPA"), Neb. Rev. Stat. § 48-1104 (Reissue 2004).[3]  Hoover apparently bases these claims on allegations that (a) Archuleta failed to seek a pay raise for Hoover; (b) Archuleta and Castillo participated in harassing conduct, thereby creating a hostile work environment; (c) Defendants' non-discriminatory reasoning for not seeking

---

[3] For the reasons already discussed, Hoover's FEPA claims are subsumed by the applicable federal law and will not be separately discussed.  *See Al–Zubaidy v. TEK Industries, Inc.*, 406 F.3d 1030, 1039–40 (8th Cir. 2005) (failure of claims under Title VII dooms similar claims under NFEPA).

a raise for Hoover were pretextual; and (d) that Defendants retaliated[4] against Hoover when he engaged in protected activity.

"Gender discrimination claims may be brought under both Title VII and the Equal Pay Act, but the laws differ." *Bauer v. Curators of Univ. of Missouri*, 680 F.3d 1043, 1045 (8th Cir. 2012). The Eighth Circuit has recently explained that the EPA is a strict liability statute, in which the plaintiff need not prove an employer acted with discriminatory intent. *Id.* (citing *Strecker v. Grand Forks County Soc. Serv. Bd.*, 640 F.2d 96, 99 n. 1 (8th Cir.1980), *rev'd on other grounds*, *Pullman–Standard v. Swint*, 456 U.S. 273 (1982). However, under Title VII, the plaintiff bears the burden of demonstrating that an employer intentionally discriminated against the plaintiff. *Id.* (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–55 (1981)). If the employee establishes a prima facie case of discrimination, "the employer may assert 'a legitimate, nondiscriminatory reason for its adverse employment action.'" *Id.* (quoting *Burdine,* 450 U.S. at 252–55). An employee may then present evidence that the employer's proffered reasons are pretextual. *Id.* "An employer under the EPA carries the burden of persuasion and must prove an affirmative defense; a Title VII defendant need only articulate a defense." *Id.* at 1045-46.

### a.    Prima Facie Case

To support his claim of discrimination under Title VII, Hoover can present direct evidence of discrimination or create "an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas Corp.*" *Humphries v.*

---

[4] The Court addresses Hoover's claim for retaliation below and incorporates its reasoning to the extent Hoover claims retaliation under Title VII.

*Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688, 692 (8th Cir.2009) (internal quotation marks and citations omitted).  Hoover does not offer direct evidence of discrimination, and the *McDonnell Douglas* framework applies.  To survive summary judgment, Hoover "must present a prima facie case of gender discrimination, which requires proof in the record that: (1) [he] was a member of a protected class; (2) [he] was qualified for [his] job; (3) [he] suffered an adverse employment action; and (4) there are facts that give rise to an inference of unlawful gender discrimination." *Wells v. SCI Mgmt., L.P.*, 469 F.3d 697, 700 (8th Cir. 2006) (citing *Rorie v. United Parcel Serv., Inc.,* 151 F.3d 757, 760-61 (8th Cir.1998)).  Hoover analogizes his claim that Defendants failed to give him a raise to the failure-to-promote claim analyzed in *Peterson v. Scott Cnty.*, 406 F.3d 515, 523 (8th Cir. 2005), *abrogated in part by,* *Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011).  In *Peterson*, the Eighth Circuit noted that to meet the prima facie burden, the plaintiff must demonstrate that he was similarly situated to the employees who were promoted.  *Id.*

In this case, Hoover claims he was similarly situated to Perez and Mencl, but did not receive a raise.  For the reasons discussed above, Hoover has not demonstrated that he was similarly situated to Mencl and Perez.  "[I]ndividuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000).  Hoover's evidence relies principally on his experience prior to working with DAS, and does not provide evidence that his job duties were similar in terms of effort and responsibility to the duties of Mencl and Perez.  Defendants provided evidence that at the time Mencl

19

and Perez were given raises, Mencl and Perez had requested a raise and had taken on significant additional duties.  Further, Defendants presented evidence of Hoover's argumentative attitude and poor performance.  Although Hoover claims he was treated unfairly, he does not provide any evidence that a female individual was accused of similar behavior and not disciplined or treated differently.  For these reasons, Hoover has failed to meet his burden under Title VII, and has failed to prove discriminatory intent.

### b.   Legitimate Nondiscriminatory Reason

Even if Hoover had met his burden of proof, Defendants have offered a legitimate nondiscriminatory reason for failing to seek a raise for him at the same time as Mencl and Perez.  In addition to the factors discussed above, the undisputed evidence demonstrates that Hoover had less seniority at DAS than Mencl and Perez.  Further, there is evidence Mencl and Perez actually requested a raise, while Hoover did not.  For the reasons already discussed, Defendants offered a legitimate, nondiscriminatory reason for Mencl and Perez's raises.

### c.   Pretext

Hoover claims that even if Defendants provided a nondiscriminatory reason, it was pretext for discriminatory behavior.  Hoover bears the burden of proving pretext. *Onyiah v. St. Cloud State Univ.*, 684 F.3d 711, 716 (8th Cir. 2012) *cert. denied,* 133 S. Ct. 1502 (2013).  Hoover argues that he has provided "significant evidence that the alleged performance deficiencies were not of actual, but fabricated concern only brought up following the Plaintiff's complaints of discrimination and harassment."  (Filing No. 25 at 52.)  Despite this conclusory statement, Hoover fails to provide any evidence

20

that Defendants' nondiscriminatory explanation was pretext for discriminatory behavior. There is no evidence that Hoover ever requested a raise, even though there is no evidence that he would have been considered for one had he made the request. (*See* Filing No. 20-25 (stating that it was unclear whether Hoover took on additional duties, and recommending that DAS be "progressive and address this issue if this request, or a modified request, is forwarded to State Personnel."). Hoover offers no link between any alleged discriminatory behavior and any discrepancy in pay between himself and Mencl and Perez. Accordingly, he has failed to demonstrate that Defendants' explanation is pretextual.

### III.  Title VII Claims for Hostile Work Environment

Within Hoover's second cause of action, he asserts a claim for hostile work environment based on gender. Title VII makes it "unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 990-91 (8th Cir. 2003) (quoting 42 U.S.C. § 2000e-2(a)(1)). In other words, Title VII bars the "[h]arassment of an employee based on a prohibited factor (e.g., gender, race, religion)." *Id.* at 991 (citing *Palesch v. Mo. Comm'n on Human Rights*, 233 F.3d 560, 566 (8th Cir. 2000)).

To establish a harassment-based, hostile work environment claim, the employee "must establish that: (1) he is a member of a protected class; (2) he was exposed to unwelcome harassment; (3) the harassment was based on a protected characteristic of the plaintiff; (4) the harassment affected a term, condition, or privilege of employment;

and (5) the employer knew or should have known about the harassing behavior, but failed to take proper action to alleviate it." *Al–Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1038 (8th Cir.2005). "The standard for demonstrating a hostile work environment under Title VII is 'demanding,' and 'does not prohibit all verbal or physical harassment and it is not a general civility code for the American workplace.'" *Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.*, --- F.3d ---, 12-3250, 2013 WL 4529461 (8th Cir. Aug. 28, 2013) (quoting *Wilkie v. Dep't of Health and Human Servs.*, 638 F.3d 944, 953 (8th Cir. 2011)). Courts look to the totality of the circumstances to determine whether the harassment affected a term condition or privilege of employment, the employee must demonstrate that the conduct was extreme, such that intimidation and ridicule permeated in the workplace. *Id.* The harassment must be "severe 'as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim.'" *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 892 (8th Cir. 2005) (quoting *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840 (8th Cir. 1998)).

"Sporadic or casual comments are unlikely to support a hostile environment claim." *Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir. 1999) (citing *Cram v. Lamson & Sessions Co.*, 49 F.3d 466, 474 (8th Cir. 1995); *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir. 1981)). "'[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)'" are also insufficient, and the "'[m]ere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to support a claim of hostile work environment.'" *Watson v. CEVA Logistics U.S., Inc.*, 619 F.3d 936, 942 (8th Cir.2010) (quoting *Arraleh v. Cnty. of Ramsey*, 461 F.3d 967, 979 (8th Cir. 2006), *cert. denied*,

22

127 S. Ct. 2100 (2007)).   The "'conduct must be extreme and not merely rude or unpleasant.'"   *Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 993 (8th Cir. 2003) (quoting *Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir. 2003)). In other words, "'the workplace [must be] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"   *Singletary*, 423 F.3d at 892 (quoting *Tademe*, 328 F.3d at 991).

Hoover fails to describe harassment that affected a term, condition, privilege of employment because the harassing conduct he allegedly suffered was not sufficiently severe or pervasive to constitute actionable discrimination.   Hoover does not demonstrate that the alleged conduct and comments were more than offhand comments, isolated incidents, or utterances that engendered offensive feelings.   Many of the incidents Hoover described do not identify a specific link between Hoover and the alleged harassment.   For example, Hoover points to Archuleta's alleged description of males in the office as "penis-slingers," (*See* Filing No. 25 at 48), and other general derogatory remarks.   Such remarks are insufficient on their own to establish a hostile work environment.   In *Singletary*, for example, the plaintiff was subjected to racial slurs from employees in his capacity as an internal affairs investigator.   423 F.3d at 893. However, the court upheld summary judgment where the plaintiff could not demonstrate that the actions were pervasive, or that they were made directly to the plaintiff.   *Id.* Likewise, Hoover does not provide evidence that derogatory comments were made directly to him.   Nor has he demonstrated that offensive conduct was so frequent and

severe that a reasonable person would view them as altering Hoover's conditions of employment.

Although Hoover also claims that he experienced sex discrimination when he was not allowed to work from home, he has failed to adduce evidence that this was due to his sex. The undisputed evidence demonstrates that males were permitted to work from home, and Hoover provides no evidence that the revocation of that privilege was due to his sex. There is no evidence that other males were prevented from working from home, and thus there is no evidence of widespread sexual favoritism. Hoover has failed to demonstrate that Defendants' action was sufficiently severe or pervasive to alter the conditions of Hoover's employment, nor has he demonstrated that much of the alleged harassing behavior was directed at him personally. Accordingly, Hoover has failed to establish his claims for hostile work environment.

## IV.   Equal Protection

Hoover brings his third cause of action under the Equal Protection Clause of the Fourteenth Amendment. However, in the substantive allegations, Hoover alleges that the "actions of Defendant constitute a violation of Neb. Rev. Stat. § 48-1111(2) and Title VII of the Civil Rights Act of 1964." (Filing No. 1-1 ¶ 40.) To the extent that Hoover's claim is based on violations of Title VII, the claim fails for the reasons already discussed. Further, even if the Complaint can be construed to bring an Equal Protection claim, Hoover's claim fails. To recover under § 1983, a plaintiff must prove "(1) violation of a constitutional right, (2) committed by a state actor, (3) who acted with the requisite culpability and causation to violate the constitutional right." *McDonald v. City of Saint Paul*, 679 F.3d 698, 704 (8th Cir. 2012) (quoting *Shrum ex rel. Kelly v.*

24

*Kluck,* 249 F.3d 773, 777 (8th Cir.2001)).  The Equal Protection Clause requires "that state actors treat similarly situated people alike." *Id.* at 705 (quoting *Ganley v. Minneapolis Park and Recreation Bd.,* 491 F.3d 743, 747 (8th Cir.2007)).  Thus, as a threshold matter, Hoover must prove that the Defendants treated him differently than similarly situated employees. *Id.*

Hoover acknowledges that this claim lies against Archuleta and Castillo only. Defendants argue that both are immune from suit under the doctrine of qualified immunity.  However, the Court need not address the issue of qualified immunity because Hoover has not met his burden.  Hoover's only alleged comparitors are Mencl and Perez, and the only basis for his claim is Archuleta and Castillo's failure to give Hoover a raise similar to that of Mencl and Perez.  For the reasons already discussed, Hoover has not demonstrated that he was treated differently than similarly situated female employees.  Accordingly, to the extent Hoover alleges a claim under § 1983, Defendants are entitled to summary judgment.

## V.    Retaliation

Hoover's final cause of action alleges that Defendants retaliated against Hoover for reports and complaints of discriminatory behavior.  "Title VII prohibits employers from retaliating against employees who file charges of discrimination."  *Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 818 (8th Cir. 1998) (citing 42 U.S.C. § 2000e-3(a)). The burden-shifting analysis set forth in *McDonnell Douglas*, "'governs the order and allocation of proof for retaliation claims'" under Title VII.  *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 880 (8th Cir. 2005) (quoting *Kratzer v. Rockwell Collins., Inc.*, 398 F.3d 1040, 1048 (8th Cir. 2005)).

"Under this analysis, a plaintiff must first establish a prima facie case of retaliation." *E.E.O.C. v. Kohler Co.*, 335 F.3d 766, 772 (8th Cir. 2003). The plaintiff "establish[es] a prima facie case by showing that he or she: '(1) engaged in statutorily protected activity; (2) he suffered an adverse employment action, and (3) there was a causal connection between the adverse employment action and the protected activity.'" *Logan*, 416 F.3d at 880 (alteration in original) (quoting *Kohler*, 335 F.3d at 772). "'[T]he threshold of proof necessary to establish a prima facie case is minimal.'" *Id.* at 881 (quoting *Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1022 (8th Cir. 1998)). The "defendant must then rebut the plaintiff's prima facie case by presenting evidence of a legitimate, non-retaliatory reason for the action it took against the plaintiff." *Kohler*, 335 F.3d at 772-73 (citing *Coffman v. Tracker Marine, LP*, 141 F.3d 1241, 1245 (8th Cir. 1998)).

"If the defendant satisfies its burden, the plaintiff is 'then obliged to present evidence that (1) creates a question of fact as to whether [defendant's] reason was pretextual and (2) creates a reasonable inference that [defendant] acted in retaliation.'" *Logan*, 416 F.3d at 880 (alterations in original) (quoting *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002)). "'[A]n employee's attempt to prove pretext . . . requires more substantial evidence [than it takes to make a prima facie case], . . . because unlike evidence establishing the prima facie case, evidence of pretext . . . [and retaliation] is viewed in light of the employer's justification.'" *Id.* at 881 (second and third alterations in original) (internal quotation marks omitted) (quoting *Allen Health Sys.*, 302 F.3d at 834).

Defendants contend that Hoover failed to establish that he suffered an adverse employment action.  The Eighth Circuit has consistently held that, "to be materially adverse, retaliation cannot be trivial; it must produce some injury or harm." *Littleton v. Pilot Travel Centers, LLC*, 568 F.3d 641, 644 (8th Cir. 2009) (citing *Gilbert v. Des Moines Area Cmty. Coll.,* 495 F.3d 906, 917 (8th Cir. 2007)).  The Eighth Circuit has concluded that "commencing performance evaluations, or sending a critical letter that threatened appropriate disciplinary action, or falsely reporting poor performance, or lack of mentoring and supervision were actions that did not establish a prima facie case of retaliation, absent showings of materially adverse consequences to the employee." *Id.* (internal citations omitted).

In this case, Hoover alleges that Defendants retaliated against him after he complained of discrimination.  Hoover alleges that, as a result, he was arbitrarily placed on a performance improvement plan, was subjected to a false performance evaluation, was denied benefits, was placed under surveillance, and was informed that his notice of allegations would be purged from records.  Nearly every one of these allegations was expressly rejected as a non-adverse employment action in *Littleton.  See id.*  Hoover's broad allegation that he was denied benefits is not supported by the evidence.  The only discernible benefit he was denied was having his work-from-home privileges suspended. According to Hoover's timeline, this occurred several weeks after his informal complaint, and before he filed a formal complaint.  Further, such an action would not have dissuaded a reasonable worker from making a charge of discrimination under the circumstances.  *See id.*  Hoover has failed to come forth with evidence that he

suffered a materially adverse employment action.  Accordingly, Defendants are entitled to summary judgment on his retaliation claim.

## CONCLUSION

Hoover has failed to demonstrate that he was treated differently than similarly situated females.  Although Mencl and Perez both worked within his division, the undisputed evidence demonstrates that Castillo and other directors concluded that Mencl and Perez had taken on additional duties. Hoover failed to demonstrate that any additional duties he took on made him similarly situated to female comparitors. Furthermore, Hoover failed to adduce evidence that the Defendants' reasoning for not giving him a raise were pretextual or retaliation for Hoover's complaints.  Accordingly,

IT IS ORDERED:

1.    The Motion for Summary Judgment (Filing No. 18), filed by Defendants, the State of Nebraska through the Nebraska Department of Administrative Services, Amy Archuleta, and Carlos Castillo (collectively "Defendants") is granted;

2.    Plaintiff's claims are dismissed with prejudice;

3.    The Defendants' Motion to Strike and Objections to Plaintiff's Exhibits (Filing No. 33) are overruled as moot; and

4.    A separate judgment will be entered.

Dated this 19th day of September, 2013.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge